COMMONWEALTH vs. ARNOLD D. GABBIDON.

Norfolk. September 22, 1983. — February 22, 1984.

Present: PERRETTA, DREBEN, & WARNER, JJ.

*Evidence*, Bias of government witness, Hearsay, Exculpatory. *Practice, Criminal*, Examination of jurors, Challenge of jurors, Venue, View, Argument by prosecutor. *Search and Seizure*, Plain view.

At the trial of indictments arising from a shooting on the Southeast Expressway, it was reversible error to exclude testimony by the defendant's uncle that a government witness had told the uncle that the witness's drug dealing business was "not running right" since an associate had left, that the associate had "done something on the Expressway," and that the witness was "going to stick it to someone," where the testimony was relevant to show the witness's bias and motive to lie, and where the only unequivocal evidence at the trial linking the defendant to the shooting was the testimony of this witness. [530-532]

There was no error in the denial of a defendant's motion to suppress from evidence a photograph album seized by police while searching the defendant's apartment pursuant to a warrant authorizing a search for specific items, including "[t]ools used to cut a carbine barrel," where the judge was warranted in concluding that the album "was a reasonable place to look for a saw blade." [532-533]

There was no merit to contentions made by a criminal defendant, a black person, charged with crimes against a white victim that to protect his right to trial by an impartial jury he was entitled to a change of venue, additional questions to prospective jurors on voir dire, and extra peremptory challenges. [533-534]

At the trial of indictments arising from a shooting on the Southeast Expressway, the judge, having allowed the jury to take a view of the defendant's automobile, did not abuse his discretion in denying the defendant's request that each juror be seated in the automobile in order to better appreciate its interior layout and dimensions. [535]

At the trial of indictments arising from a shooting, the unexplained loss of a photograph of a person other than the defendant holding a gun similar to the one used in the shooting, which had been introduced in evidence at a pretrial hearing on a motion to suppress, did not entitle the defendant to a mistrial. [535-536]

Reversal of criminal convictions was not required by certain statements made by the prosecutor in his closing argument where the statements appeared to be somewhat inaccurate recitations of the evidence presented, rather than significantly improper argument calculated to prejudice the defendant. [536]

INDICTMENTS found and returned in the Superior Court Department on September 8, 1981.

The cases were tried before *Hurd*, J.

*Barry P. Wilson* for the defendant.

*Charles J. Hely*, Assistant District Attorney, for the Commonwealth.

PERRETTA, J.  The defendant was tried on indictments charging him with armed assault with intent to murder, assault and battery by means of a dangerous weapon, and unlawfully carrying a firearm.  The jury was unable to reach a verdict, and a mistrial was declared.  On retrial, the defendant was found guilty of the latter two offenses and so much of the first as charged assault with intent to kill.  The primary contention on appeal is that testimony (admitted in evidence at the first trial) offered to show that the Commonwealth's chief witness was biased against the defendant and had a motive to lie was erroneously excluded from evidence. We reverse.

On July 16, 1980, about 2:00 A.M., John M. Fitzgerald left work and was driving home on the Southeast Expressway when he saw a sports car up ahead.  Fitzgerald was driving in the right lane at about forty-five miles an hour and he was quickly gaining on the car.  He described the car as red, a little bigger than a foreign car, American made with chrome mud-flaps, wrap-around bumper-type reflecting units, and a sloping back.  The license plate was green on white, three digits followed by three letters.

As Fitzgerald drew closer to the red car, he saw the passenger-side window being lowered.  He drove a bit closer to the right of his lane, accelerating his car to pass.  Seeing a muzzle flash from the window of the red car, Fitzgerald ducked.  His windshield shattered, and glass spilled into his

car. He heard two more shots being fired in rapid succession. Fitzgerald was unable to give any description of the car's occupant or occupants because he never saw into the red car.

In its case against the defendant, Errol Mohammed was the Commonwealth's key witness. Mohammed testified that he was a friend of the defendant and saw him frequently in 1980. During that time, the defendant owned a 1979 red Trans Am car. On the night of July 16, 1980, the defendant came to Mohammed's house and asked to watch the news broadcast on television. When a report came on the news that a man had been shot on the Southeast Expressway, the defendant said to Mohammed, "That's me. I did that." Mohammed asked the defendant, "Are you crazy?" and he answered: "This is the right time. This is the time for the revolution." Mohammed testified that the defendant also told him that he had been trying out his "chopper," referring to a gun, and that he hoped "the guy don't make it" because he might have been able to describe the defendant's car.

Mohammed stated (on cross-examination) that he recalled seeing the district attorney on television requesting anyone with information concerning the shooting to call his office. Mohammed stated that he did not call the district attorney's office; rather, sometime during the year he called and left a message with the F.B.I., but no one returned his phone call.

On direct examination, Mohammed stated that in June of 1981, almost a year after the shooting, the defendant told him that he wanted to sell his gun in order to pay off the loan for his car and that he wanted to go to Canada or New York, "if things don't work out." The defendant asked Mohammed to look for a buyer for the gun, and he told Mohammed that he would give him $100 from any sale.

On July 14, 1981, Mohammed contacted and met with William J. Powers, an undercover State trooper.[1] Powers

[1] Mohammed denied on cross-examination that he was a police informant. His credibility on this point was impeached with his testimony from the first trial, where he admitted to being an informant on drug involve-

later testified that when he met with Mohammed on July 14th, Mohammed told him that he knew a man who wanted to sell the gun used in the Expressway shooting and that this man owned a red Trans Am. As a result of the meeting, Powers arranged a second meeting between Mohammed, the defendant, and Gilbert Bernard, another undercover State trooper.

Mohammed drove the defendant to the pre-arranged location on July 16, 1981, and was present during Bernard's negotiations with the defendant for the purchase of the gun. Mohammed testified that the defendant told Bernard that the gun had no "kick" to it, and that he (the defendant) could rest the gun on a window and pull the trigger.[2]

Bernard testified that the meeting ended on the agreement that if he could raise the money to buy the gun, he was to reach the defendant through Mohammed. The next day, Bernard and Mohammed met with the defendant in the bedroom of his apartment. The defendant took a gun from under the bed and gave it to Bernard along with a clip and a bag of bullets.

The police test fired the gun and compared the projectile fired from it with a .45 caliber bullet jacket and jacket fragment recovered from Fitzgerald's car. A ballistician testified that in his opinion the jacket and jacket fragments recovered from Fitzgerald's car had been fired from the gun sold by the defendant. Search warrants for the defendant's apartment and car were issued. In the defendant's bedroom, the police found a box of .45 caliber ammunition, a

ments, and was also impeached by Powers' testimony at the present trial. Powers stated he knew Mohammed prior to July 14, 1981, that Mohammed was a police informant, that Powers had arranged to relocate Mohammed, and that Mohammed received about $350 a month from the Commonwealth as a rent "subsidy" because of his relocation.

[2] Bernard testified to his conversation with the defendant as follows: "I asked him what type of a weapon it was. He said that it was a semi-automatic .45 calibre . . . a rifle-type of a weapon . . . . I said that if it was a .45 calibre weapon, it must have had a pretty strong kick to it. He advised me 'No.' He said that you could fire the weapon easily with one hand. It had very little recoil; almost no kick at all."

photo album containing two pictures, one of the defendant and one of another man, each holding a gun similar to the one the defendant had sold and which had been admitted in evidence. The gun was also test fired from the defendant's seized car. A ballistician fired from the driver's seat out the passenger's window and testified that the recoil was "very, very, light."

When the defendant indicated that he would call Lincoln Nevers, his uncle, to testify, the Commonwealth requested a voir dire.[3] Nevers, in response to direct examination by the Commonwealth on voir dire, stated that he knew Mohammed in 1979. In June of 1981, he and Mohammed had a conversation. Mohammed was "talking about his business. He's a dope dealer." Nevers related that Mohammed complained that since Colin Powell "leave here, his business not running right." When Nevers asked why Colin had left, Mohammed told him that "Colin done something on the Expressway and him, Mr. Mohammed, going to stick it to someone." Nevers asked Mohammed what Colin had done and Mohammed cut off the discussion.

Nevers further testified on voir dire that Mohammed and Powell "used to buy dope." He also related that both Mohammed and Powell drove the defendant's car many times, "when Gabbidon is at work." Nevers related that he was in Mohammed's basement in late May, 1981, and saw a gun that resembled the one in evidence.

At the conclusion of the hearing, the trial judge ruled that the conversation between Nevers and Mohammed concerning the Expressway was inadmissible.

Before the jury, Nevers testified that, in 1980 and 1981, he lived with the defendant, that Mohammed was a "dope dealer," and that Mohammed and Powell frequently drove the defendant's car. He repeated how he had seen a gun in Mohammed's basement, and he stated that about a week later, Mohammed told him that his (Mohammed's) drug

---

[3] It was the Commonwealth's position that Nevers' testimony, which had been admitted in evidence over its objection at the first trial, was inadmissible hearsay.

business had not been "right" since Powell had left. Nevers testified that on one occasion sometime in 1979, Powell came to Nevers' apartment with a gun resembling the one in issue.[4]

The defendant also called State Trooper Robert Murphy to testify. He acknowledged that the defendant's photo album had contained a picture of Powell holding a gun similar to the one claimed to have been used in the shooting.

1. *The Conversation Between Nevers and Mohammed.*

The Commonwealth's position at trial was that the conversation between Nevers and Mohammed was being offered as a declaration against penal interest, see *Commonwealth v. Carr*, 373 Mass. 617 (1977), which it seemed to view as synonymous with "third-party culprit" evidence. See *Commonwealth v. Murphy*, 282 Mass. 593, 597-600 (1933); *Commonwealth v. Geraway*, 355 Mass. 433, 440-441 (1969). The Commonwealth is correct that the evidence was not admissible on either of those theories. Because Mohammed's statement contained no hint that he was responsible for Fitzgerald's shooting, it was not a threat to any penal interest Mohammed might have had. On the other hand, if the conversation is viewed as "third-party culprit" evidence, it pointed at Colin Powell as the culprit, not Mohammed.

In excluding the conversation, the trial judge gave no reasons for his ruling. The defendant, however, had expressly disavowed reliance on the declaration against penal interest exception to the hearsay rule (correctly, we think). Moreover, if the conversation were being offered to show that "one other than the defendant had 'motive, intent, [and] opportunity' to have committed the crime," *Commonwealth v. Geraway*, 355 Mass. at 441, quoting from *Commonwealth v. Murphy*, 282 Mass. at 597-600, we would see no error in the exclusion of the conversation as it is "too weak in probative quality," *ibid.*, on that issue. See also *Commonwealth v. Mandeville*, 386 Mass. 393, 399 (1982). Compare *Commonwealth v. Graziano*, 368 Mass. 325, 329-330 (1975).

---

[4] State Trooper Brooks was called as a rebuttal witness by the Commonwealth. He testified that Nevers had admitted to him that once in his (Nevers') apartment he had held a .45 caliber semi-automatic rifle belonging to the defendant.

The defendant did not, however, offer the conversation for its substantive value on the question whether Colin Powell, rather than he, had committed the crime. Rather, the conversation was offered for the limited purpose of impeaching the credibility of the Commonwealth's chief witness. The defendant argued, and he does so on appeal, that the facts that Colin Powell had access to the gun and the defendant's car, that Colin Powell and Mohammed had had drug dealings with each other, and that Mohammed had told Nevers that the drug business was not going right since Colin Powell had left because he had done something on the Expressway for which Mohammed was "going to stick it to someone," are facts which show that Mohammed had a strong motive to lie. Because Mohammed was asked about the conversation with Nevers on cross-examination and denied that he had ever made those statements, the defendant also argues that the conversation is evidence of a prior contradictory statement.

The reliability and credibility of Mohammed was essential to the proof of the defendant's guilt. "The credit of a witness, upon whose testimony in part the issue is to be determined, is not merely collateral, and cannot be immaterial. The weight of his testimony with the jury may depend entirely upon their supposition that he is under no influence to prevaricate . . . . [H]is state of mind and feeling ought to be known to the jury." *Day* v. *Stickney*, 96 Mass. 255, 258 (1867). When a defendant seeks to show that a witness is not fair or is "under a strong bias of feeling or purpose adverse to [him]," *id.* at 257, the defendant may do so by extrinsic evidence or he may (but is not required to) do so by first cross-examining the witness as to his partiality and then bias, "if denied by the witness himself, may be proved by other testimony as a contradiction in a material point; which is one mode of impeaching the credit of a witness." *Id.*, at 258. See also Liacos, Handbook of Massachusetts Evidence 146 (5th ed. 1981). Hence, whether the conversation should have been admitted on either of the defendant's two stated bases turns on a single question, that is, whether

the hearsay statements of Mohammed show hostility, bias, and motive to lie on his part.

The Commonwealth agrees that a statement by a witness that he intends to give false testimony about the crime charged would be admissible to impeach the witness but argues that "neither the phrase 'going to stick it to someone' nor its context show that this was Mohammed's intent."

We think that the conversation, when viewed in its entirety and in context (the alleged statements were made only a month before Mohammed, according to his testimony, talked with the State police even though he had known of the defendant's alleged involvement for almost a year), was evidence of bias and motive to lie which should have been considered by the jury, upon appropriate limiting instructions, in weighing Mohammed's credibility.

The information sought by Nevers' testimony had not been made known to the jury through other witnesses or evidence. See e.g., *Commonwealth* v. *Michel*, 367 Mass. 454, 461 (1975); *Commonwealth* v. *Walker*, 370 Mass. 548, 572 (1976). Compare, *Commonwealth* v. *Ahearn*, 370 Mass. 283, 287 (1976), where the court, in reversing the defendant's conviction, held: "A basic rule states that reasonable cross-examination for the purpose of showing bias and prejudice of the witness is a matter of right . . . [citations omitted]. This is not a case where the judge merely limited the scope of such examination, within his discretion; he excluded the total inquiry by his several rulings. The evidence, which was clearly relevant on the issue of the alleged bias of the witnesses, should have been admitted for the jury's consideration."

The defendant's convictions must be reversed, and we next consider those allegations of error which may recur on any retrial of the defendant.

2. *Other Issues.*

A. *Motion to Suppress.*

The search warrant obtained by the State police authorized a search of the defendant's apartment for specific items, including "[t]ools used to cut a carbine barrel." In executing

the warrant, the police seized from the defendant's bedroom a photograph album. Among the photographs contained in the album were two pictures, one of the defendant and one of another man, both holding a gun resembling the one used in the shooting.

At the hearing on the motion, Trooper Murphy testified that he looked through and touched every page of the album to see whether a hacksaw blade was concealed in the album. Murphy also testified that other books in the defendant's bedroom were similarly examined.

The defendant argues that the album and photographs must be suppressed because those items were not specified in the warrant and their discovery was not inadvertent. He contends that the police "were on a fishing expedition — looking for anything having to do with the crime."

The findings and conclusions of particular pertinence made by the motion judge are: the album "was a reasonable place to look for a saw blade"; that point "is underscored by the fact that the police did not go through every book they saw in the apartment but, rather, searched only those through [*sic*] containing compartments and obviously thick enough to house a saw blade"; and, "it was reasonable for the police to note the particular content of these photographs inasmuch as they could not be expected to close their eyes while they felt for the saw blade."

The findings and conclusions were warranted on the evidence, *Commonwealth* v. *Jones*, 375 Mass. 349, 354 (1978); *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980), and there was no error in the denial of the motion. See *Commonwealth* v. *Cefalo*, 381 Mass. 319, 330-332 & n.9 (1980).

B. *The Jury Selection Process.*

The defendant, a black person, argues that, because there was evidence that racial hostility motivated these crimes against a white victim, he was entitled to special precautions to protect his right to trial by an impartial jury. He contends, therefore, that it was error to deny his motions for a change of venue, additional questions to prospective jurors on voir dire, and extra peremptory challenges. The record before us shows that there is no merit to any of the claims.

A case may be transferred to another county for trial "if the court is satisfied that there exists in the community where the prosecution is pending so great a prejudice against the defendant that he may not there obtain a fair and impartial trial." Mass.R.Crim.P. 37(b)(1), 378 Mass. 915 (1979). The defendant's sole claim in furtherance of his motion was that the case should be transferred to Suffolk County because the black population of Norfolk County was less than one percent (specifically, .99 percent) of that community. The defendant makes no claim that the black population of Norfolk County was under-represented on the jury "due to systematic exclusion of the group from the jury-selection process," *Commonwealth* v. *Williams,* 378 Mass. 217, 221 (1979), quoting from *Duren* v. *Missouri,* 439 U.S. 357, 364 (1979). See also *Commonwealth* v. *Bastarache,* 382 Mass. 86, 93-94 (1980). Nor did the defendant contend that there was any prejudice against him. Cf. *Commonwealth* v. *Bianco,* 388 Mass. 358, 367 (1983).

The questions put to the prospective jurors, as a group and individually, for the purpose of discovering any racial bias were almost identical to those asked and found to be "clearly sufficient" in *Commonwealth* v. *Grace,* 370 Mass. 746, 757 & n.5 (1976), under the requirements of *Ham* v. *South Carolina,* 409 U.S. 524, 527 (1973).[5] Further, the trial judge gave the defendant an additional peremptory challenge and seated twenty-four prospective jurors before any of the peremptory challenges were to be exercised. See *Commonwealth* v. *Walker,* 379 Mass. 297, 299 (1979).

The procedures here followed satisfied both G. L. c. 234, § 28, and *Ham* v. *South Carolina,* 409 U.S. at 527, and the defendant has no basis for claiming that he is entitled to even greater precautionary measures.

---

[5] The trial judge also excluded any reference to the defendant's alleged membership in and allegiance to the Rastafarian sect, a group described by the Commonwealth in a trial memorandum as one whose members "'consider the white man to be the personification of evil.' Barrett, Leonard, *The Rastafarians: Sounds of Cultural Dissolution,* xiii."

C. *Motion for a View.*

Although the trial judge allowed the jury to take a view of the defendant's car, he denied the defendant's request that each juror be seated in the automobile in order to better appreciate its interior layout and dimensions.

As the question whether there is to be a view at all is a matter within the trial judge's discretion, so too is the question of the limits of any view. We see no abuse of that discretion. See *Commonwealth* v. *Rodriguez,* 378 Mass. 296, 307 (1979); *Commonwealth* v. *Perkins,* 6 Mass. App. Ct. 964 (1979).

D. *Lost Evidence.*

One of the photographs taken from the defendant's album was a picture of Colin Powell holding a gun similar to the one used in the shooting. That photograph was introduced in evidence at the hearing on the defendant's motion to suppress held prior to the first trial. Each party blames the other for its loss. The defendant also argues that, because the picture is exculpatory, he was entitled to a mistrial or to a stipulation by the Commonwealth as "to its loss and what it depicted."

First, we note that the defendant's characterization of the photograph as exculpatory evidence is not accurate to the extent he implies that it constitutes "third-party culprit" evidence. (See part 1 of this opinion, *supra.*) It would seem, in light of the evidence presented at the first and second trials, that the photograph would, at best, have been admissible only to buttress the defendant's assertion that Powell's and the defendant's access to the gun gives Mohammed a foundation upon which to build his supposedly false testimony. As it has not been shown that the Commonwealth has suppressed evidence material to the question of the defendant's guilt or even that it is responsible for the loss, a mistrial would have been a most inappropriate remedy. See *Commonwealth* v. *Walker,* 14 Mass. App. Ct. 544, 546-549 (1982), and cases therein discussed.

Second, the Commonwealth did not seek to exploit the loss. At oral argument before us, the prosecutor indicated

that the Commonwealth had been willing to enter into a stipulation concerning what was depicted in the missing photograph but that it did not regard the defendant's proposed stipulation as reasonable. Finally, the transcript reveals that, even in the absence of a stipulation, the defendant conveyed, through examination of the witnesses and argument to the jury, information that Powell had access to the gun and that at one time the Commonwealth possessed a picture of him holding a gun which resembled that in evidence. In view of these circumstances, we see no prejudice to the defendant, let alone prejudice to the degree warranting the remedies sought.

E. *Closing Argument.*

In his closing argument, the prosecutor made statements to the jury which prompted the defendant to object. For the most part, we view these statements as somewhat inaccurate recitations of the evidence presented rather than significantly improper argument calculated to prejudice the defendant. Moreover, the statements were interspersed with the usual disclaimers, e.g., "as I recall," and "it's your memory that counts." In his charge to the jury, the trial judge also instructed them that the facts were to be determined on the basis of their recollection and not by what the attorneys had stated.

The prosecutor's statements concerning Colin Powell and the pulling of "names out of the air" appeared to have been aimed at dispelling the notion of a "third-party culprit." In view of our holding in part 1 of this opinion, *supra*, the Commonwealth and the defendant would be well-advised on any retrial to stay within any limits placed on such evidence by the trial judge.

*Judgments reversed.*

*Verdicts set aside.*