# Commonwealth *vs.* Sarourt Nom.

Middlesex. October 6, 1997. - November 18, 1997.

Present (Sitting at Lowell): Wilkins, C.J., Abrams, Lynch, Greaney, Marshall, & Ireland, JJ.

*Jury and Jurors. Constitutional Law,* Jury, Admissions and confessions, Waiver of constitutional rights. *Practice, Criminal,* Challenge to jurors, Voluntariness of statement, Preservation of evidence, Loss of evidence by prosecution, Instructions to jury, Capital case. *Waiver. Evidence,* Admissions and confessions, Exculpatory, Relevancy and materiality, Motive. *Intoxication. Words,* "Interrogation."

At the trial of a husband for the murder of his wife, there was no error in the judge's allowing the Commonwealth's peremptory challenge of the only black member of the venire, where the Commonwealth's stated reason was that the prospective juror had stated he had a prior "domestic arrest." [155]

In a murder case, the motion judge correctly ordered suppression of the defendant's first statement to police, where she found that the defendant was in custody and Miranda warnings had not been given; and the judge correctly ruled admissible the defendant's second, third and fourth statements, given after he had received Miranda warnings, where the first statement was not inculpatory and thus did not taint the subsequent incriminating statements. [155-156]

In circumstances in which a criminal defendant in custody invoked his right to counsel for purposes of counsel's witnessing the police conducting forensic tests on the defendant's hands, and then, without further interrogation, made an admission, a police officer's asking the defendant why he wanted an attorney, viewed in context, was not designed, or reasonably likely, to elicit an incriminating response and was not improper reinterrogation after the defendant's invocation of his right to counsel. [156-158] Ireland, J., dissenting.

In a criminal proceeding, the judge correctly ruled that the defendant's waiver of his Miranda rights was voluntary, knowing and intelligent. [158-159] Ireland, J., dissenting.

At a murder trial, in which the defendant moved for production of a tape recording of his alleged telephone call to a police department on the night the victim was shot, claiming that it was probative of whether he was intoxicated and thus incapable of deliberate premeditation, and the tape had been recorded over, the defendant failed to establish a reasonable possibility that the destroyed recording would have supplied evidence favorable to him, where there was no independent evidence that the call had occurred or that the defendant had been intoxicated at the time. [159]

At a murder trial in which there was no evidence of the defendant's intoxication, the judge did not err in declining to instruct the jury regarding that issue. [159-160]

At a murder trial, the judge did not abuse his discretion in admitting evidence that the victim had twice obtained protective orders against the defendant, where the evidence was relevant to the status of the relationship and to the defendant's motive to kill. [160]

INDICTMENTS found and returned in the Superior Court Department on May 25, 1994.

Pretrial motions to suppress evidence were heard by *Diane M. Kottmyer*, J., and the cases were tried before *Robert H. Bohn*, J.

*Mary F. Costello* (*John McKee* with her) for the defendant.

*David W. Cunis*, Assistant District Attorney, for the Commonwealth.

LYNCH, J. After a jury trial, the defendant was convicted of murder in the first degree by reason of deliberate premeditation.[1] On appeal, the defendant contends that the judge erred in (1) allowing the prosecutor's peremptory challenge of the only black juror in the venire; (2) admitting the defendant's second, third, and fourth statements to the police after suppressing his first statement; (3) ruling that the defendant's Miranda waiver was voluntary; (4) denying the defendant's motion to dismiss based on the destruction by police of potentially exculpatory evidence; (5) declining to instruct the jury on intoxication; and (6) admitting protective orders that the victim obtained against the defendant. The defendant also requests that we exercise our plenary power under G. L. c. 278, § 33E, either to order a new trial or to reduce his conviction to murder in the second degree. For the reasons set forth below, we affirm the convictions, and decline to exercise our power under § 33E.

*Facts.* We set forth the facts in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with certain issues raised. See *Commonwealth* v. *Nichypor*, 419 Mass. 209, 210 (1994); *Commonwealth* v. *Burnett*, 417 Mass. 740, 741 (1994). The defendant and the victim were husband and wife. On the morning of April 17, 1994, the victim's body was found in the defendant's automobile, which

---

[1]The defendant also was convicted of the unlawful possession of a firearm and ammunition.

was parked on Tanner Street in Lowell. She had suffered a fatal gunshot wound to the head. Later that morning, officers from the Lowell police department spoke by telephone with the defendant, who agreed to accompany them to the police station. Soon after arriving, the defendant told Inspector John Guilfoyle and Trooper James M. Connolly, in response to questioning, that he had remained home throughout the night. He also stated that his wife left at some point with his automobile and that he had not seen her or his automobile since then. The defendant had not yet received Miranda warnings. At approximately 12:35 P.M. the defendant received Miranda warnings, and immediately waived his rights. When the police subsequently requested to test his hands for gunshot residue, however, the defendant stated that he wanted an attorney present. The questioning ceased, and all police personnel left the room. Trooper Connolly then reentered and sat down and did not speak. The defendant shrugged his shoulders, and Connolly did the same. The defendant then said, "I admit it." Connolly replied, "What?," and the defendant stated that, contrary to his first statement, he was out with the victim at the La Lune Restaurant the night of the shooting. Inspector Guilfoyle, who reentered the room after the defendant's admission, then asked the defendant why he wanted an attorney. The defendant replied that he wanted an attorney only for the purpose of witnessing the gunshot residue tests. He further stated that he would continue to speak to the police without an attorney present.

At this point, the defendant received Miranda warnings both verbally and by a card which he signed. In the hours that followed, the defendant gave police a second and then a third written statement regarding his involvement in the shooting. In the second, he claimed that, while he was in the restaurant's restroom, the victim and a man with whom she had been "flirting" left with the defendant's automobile. In the third, the defendant stated that he saw the victim leaving the restaurant with the man, followed them to the automobile, and got into an altercation with the man which ended when the man fired a handgun at the defendant and then drove off with the victim. Soon after giving this statement, the defendant was arrested. The next morning, after learning that the police had gathered evidence identifying him as the shooter, the defendant made a fourth written statement, contending that he shot the victim accidentally during an argument.

1. *The peremptory challenge.* The defendant first contends that the judge erred in allowing the Commonwealth's peremptory challenge of the only black member of the venire. We disagree. Peremptory challenges are presumptively proper. *Commonwealth* v. *Burnett*, 418 Mass. 769, 770 (1994). To rebut this presumption, a moving party must show that "(1) a pattern of conduct has developed whereby prospective jurors who have been challenged peremptorily are members of a discrete group; and (2) there is a likelihood that they are being excluded from the jury solely on the basis of their group membership." *Id.* See *Commonwealth* v. *Soares*, 377 Mass. 461, 490, cert. denied, 444 U.S. 881 (1979). A moving party may successfully do so even where only a single juror has been challenged. *Commonwealth* v. *Fryar*, 414 Mass. 732, 737 (1993), *S.C.*, 425 Mass. 237 (1997). Once the moving party makes this initial showing, the burden shifts to the challenging party to provide a "group-neutral reason" for the challenge. *Commonwealth* v. *Burnett*, *supra* at 771. This reason need not be as specific as that required to justify a removal for cause, but general assertions are insufficient. *Commonwealth* v. *Soares*, *supra* at 491. Rather, the challenging party "must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." *Commonwealth* v. *Burnett*, *supra*, quoting *Batson* v. *Kentucky*, 476 U.S. 79, 98 n.20 (1986). These reasons must be "personal to the juror and not based on the juror's group affiliation." *Commonwealth* v. *Young*, 401 Mass. 390, 401 (1987).

Although the judge gave no indication that the requirements had been met, he tacitly did so by requiring the Commonwealth to provide a group-neutral reason for the exclusion of the black member of the venire. The Commonwealth did so, citing the admission of the member of the venire that he had a prior "domestic arrest." The stated reason was a specific reference to the member of the venire personally and not to his racial group. Moreover, given the fact that the defendant was charged with the most extreme form of domestic abuse, the judge was warranted in ruling this reason to be legitimate. Accordingly, there was no error.

2. *The defendant's statements to police.* The motion judge suppressed the defendant's first statement because she found that the defendant was in custody and Miranda warnings were not given. The defendant claims that this irreparably tainted his three later statements. Such taint, he contends, required their

suppression as well. Statements made following the violation of a suspect's Miranda rights are presumptively tainted and, thus, inadmissible.[2] *Commonwealth* v. *Smith*, 412 Mass. 823, 836-837 (1992). Absent circumstances requiring it to show both, see *Westover* v. *United States*, 384 U.S. 436, 494-497 (1966), the Commonwealth may overcome this presumption by showing that either: "(1) after the illegally obtained statement, there was a break in the stream of events that sufficiently insulated the post-Miranda statement from the tainted one; or (2) the illegally obtained statement did not incriminate the defendant, or, as it is more colloquially put, the cat was not out of the bag." *Commonwealth* v. *Osachuk*, 418 Mass. 229, 235 (1994).

In the case at bar, the defendant's first statement was sufficiently not inculpatory to permit admission of the later statements. In it, the defendant claimed that he had neither seen nor heard from the victim since she left home with his automobile the previous evening. Only after receiving Miranda warnings did the defendant ultimately admit that he accompanied the victim to a local restaurant and shot her accidentally during an argument in the automobile. His initial statement did not place him at the scene of the crime, nor did it link him with the victim close to the time of the shooting. See *Commonwealth* v. *Damiano*, 422 Mass. 10, 13 (1996); *Commonwealth* v. *Osachuk*, *supra* at 236. Moreover, the fact that the police had no evidence contradicting the initial statement when it was made negates the possibility that it was inculpatory because it evidenced consciousness of guilt. *Commonwealth* v. *Smith*, *supra* at 834, 835. Finally, it is readily apparent that the latter statements were "substantially different from, and even contradictory to, the original statements." *Commonwealth* v. *Osachuk*, *supra* at 237, quoting *Commonwealth* v. *Watkins*, 375 Mass. 472, 482 (1978). Consequently, the judge did not err in admitting the latter statements.

3. *Waiver and voluntariness.* The defendant next claims that the admission of his latter statements was erroneous because (a) the police improperly reinterrogated him after he invoked his right to counsel; and (b) the defendant's later waiver of his right to counsel was involuntary.

(a) *Improper reinterrogation. Edwards* v. *Arizona*, 451 U.S. 477, 485 (1981), requires that, once a suspect invokes his right

---

[2]The defendant makes no separate argument based on the Massachusetts Constitution.

to counsel, police interrogation must cease immediately, unless the suspect "initiates further communication, exchanges, or conversations with the police." Where the suspect does so, reinterrogation may follow, but "the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Oregon* v. *Bradshaw*, 462 U.S. 1039, 1044 (1983). Thus, before police may recommence interrogation in these circumstances, they must first obtain from the suspect a voluntary, knowing, and intelligent waiver.

In the present case, the defendant claims that, prior to obtaining such a waiver, Inspector Guilfoyle recommenced interrogation by asking him why he wanted an attorney. Interrogation refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island* v. *Innis*, 446 U.S. 291, 301 (1980). See *Commonwealth* v. *Brant*, 380 Mass. 876, 883, cert. denied, 449 U.S. 1004 (1980). It "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island* v. *Innis, supra* at 300.

The evidence supports the motion judge's conclusion that no such compulsion existed. Throughout the morning of his custody, the defendant spoke freely with the police. Only as the police attempted to test his hands for blood and gunshot residue did the defendant request an attorney. At this point all questioning ceased, and the technician left the room. Shortly thereafter Trooper Connolly reentered the room but said nothing. The defendant then initiated further conversation by stating, "*I admit it*" (emphasis added). Connolly replied, "What?," and the defendant said that he had been at the La Lune Restaurant with his wife. When Inspector Guilfoyle reentered the room, Connolly asked the defendant to repeat what he had said, and he complied. Thus Guilfoyle's asking why he wanted an attorney in these circumstances was no more than a request for a clarification of the inconsistency between his earlier request and his subsequent initiation of conversation with Trooper Connolly. That this is precisely how the defendant interpreted the question is indicated by his response that he wanted an attorney "to witness the testing of his hands." In our view, the question was neither designed, nor reasonably likely, to elicit an incriminating response. *Rhode Island* v. *Innis, supra* at 301. Rather, it was

a response to the defendant's ambiguously invoking his right to counsel and then initiating further conversation with the statement, "I admit it." See *Commonwealth* v. *Torres*, 424 Mass. 792, 798 (1997) (holding police officer's comments were not interrogation because they were not "anything other than a response to the defendant's concerns"); *Commonwealth* v. *Diaz*, 422 Mass. 269, 271 (1996) (concluding detective's question, "Why?," after defendant volunteered incriminating statement was not interrogation because it was "a natural reflex action . . . that was invited by the defendant's first statement").[3] We caution, however, that, in ordinary circumstances, there would be no proper basis for an interrogator's asking a suspect his reason for requesting an attorney. In this particular context, however, the detective's question was not prejudicial.

(b) *Voluntariness of waiver.* "The Commonwealth bears the burden of proving the validity of a Miranda waiver beyond a reasonable doubt." *Commonwealth* v. *Edwards*, 420 Mass. 666, 669 (1995). "To be valid the waiver must be made voluntarily, knowingly, and intelligently." *Id.* at 670. "In determining whether a waiver was made voluntarily, the court must examine the totality of the circumstances surrounding the making of the waiver." *Id.*

The defendant relies on his status as a "high school dropout" and his limited ability to understand English as supporting his claim that he lacked sufficient intelligence to make a valid waiver. While "[i]lliteracy and low intelligence are factors in examining the totality of the circumstances leading to a waiver," *Commonwealth* v. *Taylor*, 398 Mass. 725, 728 (1986), a "mentally deficient adult may make an effective waiver." *Commonwealth* v. *Cameron*, 385 Mass. 660, 665 (1982). Here, the defendant signed a Miranda card, and later acknowledged in writing that his statements were made voluntarily. We have previously held that findings that a defendant either signed a Miranda card or indicated that he understood his rights and willingly spoke are enough to support the conclusion of a valid waiver of Miranda rights. *Commonwealth* v. *Cook*, 419 Mass. 192, 201 (1994). See *Commonwealth* v. *Cameron*, 385 Mass. 660, 665 (1982) (concluding defendant was sufficiently intelligent based on fact that police "asked the defendant if he understood the rights and received affirmative answers").

---

[3]The dissent relies on speculation and facts not found by the judge to support the conclusion that the defendant's statements were not voluntary.

Furthermore, the judge's finding that the defendant understood English was amply supported by the educational level he had attained and "from the suspect's outward behavior, most notably his indication that he understands his rights, waives them, and wishes to talk." *Commonwealth* v. *Garcia*, 379 Mass. 422, 430 (1980).

4. *Destruction of potentially exculpatory evidence.* To support his contention that the Commonwealth deprived him of exculpatory evidence, the defendant claims he called the Lowell police department the evening of the shooting and that an audiotape of the alleged conversation made by the police may have bolstered his claim that he was intoxicated, and thus incapable of killing with deliberate premeditation. The police, however, were unable to produce the tape from that evening because, by the time of the defendant's request, it had already been "recorded over."

When potentially exculpatory evidence is lost or destroyed, the court must "weigh the culpability of the Commonwealth, the materiality of the evidence, and the potential prejudice to the defendant." *Commonwealth* v. *Willie*, 400 Mass. 427, 432 (1987). With respect to potential prejudice, the defendant must, at the very least, "establish a 'reasonable possibility, based on concrete evidence rather than a fertile imagination,' that access to the [material] would have produced evidence favorable to his cause." *Id.* at 433, quoting *Commonwealth* v. *Neal*, 392 Mass. 1, 12 (1984). Here, the defendant failed to meet that burden. Aside from the defendant's statements to the police, there was no evidence that such a conversation took place. Independent proof of the defendant's intoxication was similarly lacking at trial. Thus the defendant failed to establish a "reasonable possibility" that, even if the conversation had taken place, the recording would have supplied evidence favorable to him. *Commonwealth* v. *Gabbidon*, 17 Mass. App. Ct. 525, 535-536 (1984) (refusing to grant relief where defendant made no showing that he was prejudiced by loss of evidence). Moreover, where the request for the tape was not made until the trial had begun, the defendant has not shown that the police acted in bad faith in destroying the tape. See *Commonwealth* v. *Charles*, 397 Mass. 1, 14 (1986) (holding no reversal required where exculpatory nature of tape was "mere conjecture," and where Commonwealth's loss of tape recording was neither intentional nor in bad faith).

5. *Failure to give intoxication instruction.* The defendant also

claims that the judge erred in declining to instruct the jury regarding intoxication.[4] Where evidence of intoxication is lacking, failure to instruct is not error. *Commonwealth* v. *Gil*, 393 Mass. 204, 221 (1984). At trial, the defendant could at best show only that he drank one beer on the night of the shooting. *Commonwealth* v. *Doucette*, 391 Mass. 443, 455-456 (1984) (holding no instruction was required where evidence revealed that defendant had "consumed a few drinks and three beers throughout the course of the entire day," and others found his behavior normal). Given the defendant's lack of evidence on the issue no instruction on intoxication was required. *Commonwealth* v. *Gil, supra.*

6. *Admission of protective orders.* The judge allowed evidence that the victim had twice obtained protective orders against the defendant. The defendant claims this evidence was unduly prejudicial because the protective orders were too remote in time from the killing and, alternatively, because the relationship between the defendant and the victim had improved in the interim. Evidence of a hostile relationship, including protective orders obtained by a victim against a defendant, may be admitted as relevant to the status of the relationship and to the defendant's motive to kill. See *Commonwealth* v. *Hunter*, 416 Mass. 831, 837 (1994); *Commonwealth* v. *Gil, supra* at 215-216. Here, the first protective order was issued four months prior to the killing, a shorter period than that in cases where protective orders have been held to be properly admitted. See *Commonwealth* v. *Nardone*, 406 Mass. 123, 128 (1989) (two years); *Commonwealth* v. *Gil, supra* at 217 (seven months). Moreover, the claimed "improvement" in the relationship appears to consist only of the defendant's promises, made only days before the killing, to change his behavior. Consequently, the judge did not abuse his discretion in admitting the protective orders.

7. *General Laws c. 278, § 33E, review.* We decline to exercise our plenary power under G. L. c. 278, § 33E, to order a new trial or enter a verdict of a lesser degree of guilt.

*Judgments affirmed.*

[4]Specifically, the defendant claims that the judge should have informed the jury that the defendant's intoxication may negate the possibility that he acted with deliberate premeditation.

IRELAND, J. (dissenting). In my opinion, it was simply wrong for the police to ask the defendant why he wanted an attorney. I do not think it should ever matter why a defendant wants an attorney, and I do not think that *Miranda* v. *Arizona*, 384 U.S. 436 (1966), gives the police the latitude to "clarify," see *ante* at 157, a defendant's request for an attorney. To conclude as the majority does that it is sometimes acceptable to ask a defendant why he or she wants an attorney (i.e., when a defendant engages in "ambiguous conduct," *ante* at 158) suggests that, depending on the answer to the question, the police can then decide whether to honor the request. I do not think that is the way *Miranda* works. As this court said in *Commonwealth* v. *Rainwater*, 425 Mass. 540, 544 n.2 (1997), "[P]olice officers have no business giving what an unsophisticated person might consider advice that he does not need to have a lawyer. They must remain entirely neutral on the subject." In this case, given the fact that the defendant specifically had asked for an attorney, the police did not "remain entirely neutral" when they asked the defendant why he wanted an attorney.

*Miranda* concluded that the privilege under the Fifth Amendment to the United States Constitution was so fundamental as to warrant an absolute rule, rather than case-by-case treatment.[1] *Miranda* does not provide for qualifications on the accused's request for an attorney. I believe that questioning the accused why he wants an attorney should not be allowed under any circumstances. As *Miranda* notes, the assessment of facts and circumstances in an individual case including, for example, the age, education, or intelligence of the accused "can never be more than speculation." *Id.* at 468-469. An absolute rule is "clearcut." *Id.* at 469. Here, an absolute rule would prevent the admission of inherently unreliable statements and deter police from using a potentially oppressive and abusive tactic.

Even if we were to take the alternative approach of considering the particular facts and circumstances of the case (such as the defendant's age, education, ability to comprehend English, and experience with police procedures), I firmly believe that the

---

[1] "[W]e will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. . . . [W]hatever the background of the person interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time." *Miranda* v. *Arizona*, 348 U.S. 436, 468-69 (1966).

defendant reasonably could have believed that his right to speak with an attorney depended on his giving the appearance that he was cooperating with the police. I also believe that the defendant reasonably could have maintained that belief through all subsequent interrogations, regardless how many times he received new Miranda warnings. Given the reasonableness of the defendant's belief, the Commonwealth has not met its burden of proving beyond a reasonable doubt that the defendant's statements were voluntary. *Commonwealth* v. *Tavares,* 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982).

The facts here indicate that the defendant was a high school drop-out and that English was his second language. He stated (and the Commonwealth did not dispute) that when he is nervous, his comprehension of English is impaired. The facts further indicate that at some point, the defendant was advised of his Miranda rights, that he asked for an attorney, that all questioning ceased immediately, and that shortly thereafter the defendant initiated a conversation with the police. To this point, the police activities appear permissible. The record then indicates that the police asked the defendant why he wanted a lawyer. At that point, the police activities became impermissible — either under the absolute rule that I advocate, or under the unique facts and circumstances presented.

I believe that all statements made by the defendant after he was asked why he wanted an attorney should be suppressed. Correspondingly, all evidence obtained from search warrants that were issued on the basis of those statements also should be suppressed. Accordingly, I would grant the defendant a new trial.