Frank DiBENEDETTO, Petitioner

v.

Timothy HALL, Superintendent, M.C.I.—Norfolk, and Thomas F. Reilly, Respondents

No. 99CV10843.

United States District Court, D. Massachusetts.

Aug. 25, 2000.

Wendy Sibbison, Greenfield, MA, for petitioner.

William L. Meade, Attorney General's Office, Criminal Bureau, Boston, MA, for respondents.

### Memorandum and Order

KEETON, District Judge.

## I. Introduction

Petitioner DiBenedetto petitions this court for a writ of habeas corpus under 28 U.S.C. § 2254, stating that his conviction in state court for double homicide was in violation of the Constitution of the United States. He raises two central issues of constitutional law in his petition: the Sixth Amendment right to compulsory process and to impeach witnesses against him for bias and his Fifth and Fourteenth Amendment right to due process, specifically to acquittal when the evidence is insufficient to support conviction on one of two theories of guilt submitted to the jury on a general verdict.

## II. Procedural and Factual Background

### A. Introduction

Beyond genuine dispute, on February 19, 1986, Frank Chuichiolo and Joseph Bottari were shot and killed in Boston's North End. Three months later, on May 21, 1986, a grand jury in Suffolk County indicted Frank DiBenedetto, petitioner, along with Louis Costa and Paul Tanso for the murders. DiBenedetto and Costa were tried together and convicted of two counts of first degree murder. Tanso was tried separately and convicted. In 1992, the Supreme Judicial Court of Massachusetts reversed the convictions of all three defendants and remanded for new trial. *Commonwealth v. DiBenedetto*, 414 Mass. 37, 605 N.E.2d 811 (1992) *(DiBenedetto I); Commonwealth v. Tanso*, 411 Mass. 640, 583 N.E.2d 1247, *cert. denied*, 505 U.S.

1221, 112 S.Ct. 3033, 120 L.Ed.2d 902 (1992).

DiBenedetto and Costa were retried·together in January–February, 1994. The jury found DiBenedetto guilty of two counts of first degree murder on charges of deliberate premeditation and extreme atrocity and cruelty. Costa also was found guilty of both murders. The Supreme Judicial Court of Massachusetts affirmed the convictions. *Commonwealth v. DiBenedetto,* 427 Mass. 414, 693 N.E.2d 1007 (1998).

Tanso was retried separately and acquitted in March 1994.

DiBenedetto made a timely filing of his petition in this court on April 15, 1999.

### B. Supreme Judicial Court's Recitation of the Facts

As I will explain in more detail below, *see* Part III, this habeas petition is governed by the Antiterrorism and Effective Death Penalty Act, Pub.L. No. 104–132, 110 Stat. 1214 (1996) ("AEDPA"). AEDPA provides that in a habeas proceeding, "a determination of a factual issue made by a State court shall be presumed to be correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). *See also Coombs v. State of Maine,* 202 F.3d 14, 17 (2000). As the Court of Appeals for the First Circuit has recently determined, "[f]or this purpose [under AEDPA], factual issues are defined as basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators." *Id.* (internal quotations and citations omitted).

For the purpose of deciding the appeal before them, the Supreme Judicial Court of Massachusetts (SJC) recited the procedural history and determined the relevant facts as follows:

The defendants, convicted of deliberately premeditated murder in the first degree of Joseph John Bottari and Frank Angelo Chiuchiolo, appeal, raising a multitude of issues. We reversed the defendants' previous convictions of murder in the first degree because recorded testimony of Richard Storella, a witness who was unavailable at trial, had been improperly admitted.

By the time of the defendants' retrial, Storella was available. He testified that he knew the defendants and that on the night of February 19, 1986, he had seen them, along with Paul Tanso, shoot the victims in Slye Park in the North End of Boston. According to Storella, the defendants told him that they had each shot both victims. Storella had given a number of different and inconsistent accounts of what he had seen that night, including one in which he claimed that he himself had been one of the murderers. He had been given immunity from prosecution. With good reason, the defendants strenuously challenged the reliability of Storella's testimony.

Another witness testified that he had watched the murders take place. At 9:30 P.M. that night, Joseph Schindler, a Boston lawyer, was sitting in his third-floor apartment overlooking the park when he heard four or five "cracks or pops" that he thought were fireworks. He had an unobstructed view of the park from his apartment. He looked out and saw orange-red flashes in the area of the hand of a man whom he later identified as Costa. He went to another, darkened room to obtain a better view. The sounds continued. The park was lit by the moon and artificial lights. He saw five men. Two of them fell to the ground, and the other three left the park. Leaving the park, the defendants came toward Schindler, first Costa, then Tanso, and finally DiBenedetto. Schin-

dler called the police. He described the defendants to the police, descriptions which were not entirely accurate, and later identified them in separate lineups and in three different court proceedings.

The major question for the jury was whether the defendants were two of the murderers. Convictions depended on (a) the credibility of Storella, who knew the victims and claimed to have witnessed the killings, but had repeatedly and admittedly lied about the killings and (b) the reliability of Schindler's identification of the defendants, whom he did not know. The only other incriminating evidence, the subject of vigorous challenge in this appeal, was marginally instructive testimony that a small trace of blood was found on one of DiBenedetto's sneakers.

Able appellate counsel have raised multiple challenges to various decisions and rulings in the trial court. Many of their arguments fail because the judge made rulings that lay within his discretion. There was no prejudicial error. We affirm the convictions and deny relief under G.L. c. 278, § 33E.

1. The defendants object to the admission of evidence indicating the presence of blood on one of DiBenedetto's sneakers.... They ... argue that ... the tests that led to the indication of blood on DiBenedetto's sneaker were conducted in violation of the pretrial conference report and consequently their admission violated the defendants' due process rights....

. . . . .

The ... question is whether the judge erred in admitting expert testimony that a test showed the presence of blood on one of DiBenedetto's sneakers. Neither the sneakers nor testimony concerning tests conducted on them were introduced at the first trial. In fact, the Commonwealth did not conduct its testing until December 31, 1993, shortly before the second trial. This date was well after the May 27, 1993, deadline, set pursuant to the pretrial conference report, for the delivery of "[s]cientific test reports" and the names of all Commonwealth witnesses.

On December 31, 1993, David Brody, director of the Boston police crime laboratory, tested the sneakers for the presence of blood. No test had been conducted on the sneakers since the laboratory received them on February 26, 1986. There was no apparent sign of blood on either sneaker. The test, a sensitive one using phenolphthalein followed by hydrogen peroxide, indicated blood on a small portion of the left sneaker and no blood on the right one. The blood was not necessarily human. Brody wrote a report that was promptly delivered to DiBenedetto's counsel.

One week later, in Brody's presence, a defense expert tried unsuccessfully to replicate Brody's tests. He found nothing on the left sneaker (where Brody had obtained a positive result), but he obtained a positive result on the right sneaker (where Brody's tests had produced a negative one). Brody testified that the defense expert had probably found nothing on the left sneaker because Brody's wiping of it had removed all traces of blood....

. . . . .

The test conducted by each expert in this case was substantially the same. The chance to replicate the test on the left sneaker was probably lost because Brody's testing removed the very small amount of blood at the test site. The defendant's expert found indications that blood was present on the other sneaker. There seems to be little doubt that one or both the defendant's sneakers tested

positive for the presence of a minute amount of what was either the blood of a human or some other animal or perhaps certain plant peroxidases. The judge did not abuse his discretion in admitting the blood test results. The defendants have failed to demonstrate that they were prejudiced by Brody's testing of the sneakers for blood . . . .

2. We have recently considered, and need not revisit, the question of the admission of expert testimony concerning the reliability of eyewitness identifications. The judge knew he had discretion to admit or exclude such evidence that the defendants offered. He did not abuse his discretion in excluding it. This is not a case in which there was a single eyewitness and little or no evidence to corroborate the identification . . . .

. . . . .

3. The judge did not abuse his discretion in excluding testimony intended to show that the victims, strong-arm men in a crew of La Cosa Nostra (LCN) criminals, were killed by fellow LCN members as "fallout" from an earlier LCN murder of one Vincent Limoli. The judge concluded that the Limoli murder was remote and that the proffered evidence was complicated and would divert the jury's attention. The defendants did not offer evidence, other than speculation, that some third person or persons had a motive to kill the victims because of Limoli's murder. Nor did they show that the killings in this case were sufficiently similar to the Limoli killing to warrant admission.

The defendants further argue that the judge improperly restricted their cross-examination of Storella on the same subject to show his bias. The judge barred DiBenedetto's counsel from seeking to establish on cross-examination that, be-

cause of the Limoli murder, Storella had accused the defendants falsely, out of fear, in order to protect the real killers. This was a matter within the judge's discretion. The defendants did not make a plausible showing that circumstances existed on which the alleged bias could be based.

*Com. v. DiBenedetto*, 427 Mass. 414, 415–421, 693 N.E.2d 1007 (1998) (footnotes and citations omitted).

## C. Petitioners' Arguments for Habeas Corpus Relief

Petitioner argues that he was denied a "meaningful opportunity to present a complete defense," as guaranteed by the Sixth and Fourteenth Amendments, because he was prevented in various ways by the trial judge from casting doubt on each of the three elements on which the Commonwealth constructed its case: the testimony of Storella, the testimony of the eyewitness Schindler, and forensic evidence purportedly discovered on Petitioner's sneakers. Docket No. 18 at 1 (citing *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986)). Petitioner also argues that the trial judge's denial of the motion for acquittal at the close of the prosecution's evidence was contrary to the clearly established rule in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) because the evidence was insufficient to support a conviction on the theories of joint venture that were submitted to the jury.

## III. Standard of Review

This habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act, Pub.L. No. 104–132, 110 Stat. 1214 (1996) (codified in scattered sections of 28 U.S.C.) (hereinafter "AEDPA"). That statute, enacted in 1996, greatly reduced the scope of a federal trial court's habeas review over a state court

proceeding. Under AEDPA, when a federal court reviews a state court's legal determinations, including "mixed questions of law and fact in which legal principles are applied to historical facts," *Coombs v. State of Maine,* 202 F.3d 14, 18 (1st Cir. 2000), habeas relief is to be granted only where the state court's adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d)(1) has been the subject of much interpretation and controversy among the circuit courts of appeals. In April of 2000, the Supreme Court resolved some of the conflict through its decision in *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The Court rejected the notion that the "unreasonable application" clause reiterated the "contrary to" clause, holding that the two statutory clauses have "independent meaning." *Id.* at 1519. The Court gave two examples of a state-court decision that would violate the statute's "contrary to" clause. First, "[a] state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Id.* Second, "[a] state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 1519–20.

The second step in a section 2254(d)(1) analysis is triggered when the federal ha-

beas court finds "no Supreme Court precedent [that] is dispositive of a petitioner's claim, [and thus] ... a fortiori, ... no specific rule to which the state court's decision can be 'contrary.'" *O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir.1998). In *Williams,* the Supreme Court held that, under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." 120 S.Ct. at 1523. In analyzing how a federal court should determine "unreasonableness," the Court rejected a subjective, or mixed subjective-objective inquiry, holding that the touchstone was "objective unreasonableness:"

> Stated simply, a federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case. ... For purposes of today's opinion, the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law.... Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 1521–22.

Finally, although the Supreme Court did not explicitly address the issue in

*Williams,* the Court of Appeals for the First Circuit, in *Vieux v. Pepe,* further explained the analytic framework of section 2254(d)(1) by stating that a federal habeas court must reach both prongs of section 2254(d)(1), even if a decision under the first seems to foreclose a contrary decision under the second.

[I]n certain cases, especially those involving non-"framework" claims, Court precedent will be sufficiently specific that petitioner's claim will either be contrary to or entirely consonant with the Court's rulings. If the state decision is consistent with the relevant Court decision, it plainly would not be an unreasonable application of Court precedent. Therefore, the federal court will be able to dispatch swiftly any argument under the second step of analysis.

To say this, however, is not to say that the second step analysis is unnecessary, for unless a habeas court grants relief under the "contrary to" prong, it will be required to analyze the petitioner's claim under the "unreasonable application" prong as well. To rule otherwise would be to ignore the word "or" in the statute limiting our power to grant the writ if the state decision was "contrary to, or involved an unreasonable application of," federal law.

*Vieux v. Pepe,* 184 F.3d 59, 64 (1st Cir. 1999) (citations omitted).

## IV. Petitioners' Argument for De Novo Review

■ As a preliminary matter, I reject petitioners' argument that because the Supreme Judicial Court of Massachusetts (SJC) failed to cite to federal law in its adjudication of petitioners' habeas claims, this federal district court then must review petitioners' claims *de novo,* without the deference required under AEDPA.

The principal case that petitioner cite in support of their contention that this court should review their claims *de novo* is *Cardwell v. Greene,* 152 F.3d 331 (4th Cir. 1998). In that case, the Court of Appeals for the Fourth Circuit determined it necessary to forgo review of the state court's application of clearly established Federal law because the state court had summarily dismissed the habeas petition without articulating any rational basis for its adverse determination. In other words, the court in *Cardwell* determined that because of the bare record in the state court below it had no choice but to ascertain independently—without any deference to the state's determination because that state determination was without any reasoned explanation—whether the petitioner was being held in violation of the federal Constitution.

*Cardwell* is inapposite for the following reasons.

■ *First.* As a matter of statutory construction, AEDPA does not require that a state court *cite* to federal law in order for a federal court to assess properly the federal constitutionality of the state petitioner's conviction. All that is required, by force of AEDPA's plain language, is that the underlying state adjudication *"resulted in* a decision that was contrary to, or *involved* an unreasonable application of, clearly established Federal law..." 28 U.S.C. § 2254(d)(1)(emphasis added). The Court of Appeals for the First Circuit has said as much in *O'Brien v. Dubois,* 145 F.3d 16 (1st Cir.1998), when, in discussing the second prong of § 2254(d)(1), they instructed "the habeas court [to] determine[ ] whether the state court's use of (*or failure to use* ) existing law in deciding the petitioner's claim involved an 'unreasonable application' of Supreme Court precedent." *O'Brien,* 145 F.3d at 23 (emphasis added). Although it may be more difficult

to review the "application of" federal law when the state's determination does not discuss federal law, that added difficulty does not preclude the applicability of AEDPA's deferential review. On the contrary, AEDPA's plain language and First Circuit jurisprudence together mandate that the federal habeas court review the *result* of the state court's adjudication to determine its compatibility with the Constitution of the United States under the standard set forth in § 2254(d)(1).

*Second.* Unlike the Virginia Supreme Court decision that was reviewed in *Cardwell,* the Massachusetts Supreme Judicial Court did not summarily deny petitioners' claims but wrote a lengthy opinion addressing all issues raised here in federal habeas review, as well as several others. Thus, although it is true that the SJC did not cite to federal law in its rejection of petitioners' claims, *see Com. v. DiBenedetto,* 427 Mass. 414, 693 N.E.2d 1007 (1998), it did consider those claims at length, citing to ample state authority, much of which provides commensurable or even greater protection to defendants than that guaranteed by the Constitution of the United States.

## V. Analysis of Supreme Court Precedent Protecting the Right to Present a Defense

### A. Introduction

Petitioner contends that the SJC violated clearly established federal law that guarantees "a meaningful opportunity to present a complete defense" when it upheld each of the following rulings of the trial judge as within its discretion and as not creating any prejudicial error. Docket No. 18 at 1.

The trial judge (1) forbade the attack of Storella's credibility on the basis of his motive to protect La Cosa Nostra, (2) excluded defense's expert testimony that would have cast doubt on the reliability of the prosecution's eyewitness identification, and (3) allowed in evidence the inculpatory results of last-minute forensic tests on Di-Benedetto's sneakers, tests that were performed by the Commonwealth in violation of a pretrial conference report and that destroyed any chance for the defense to retest the evidence.

■ The SJC held that each of these decisions by the trial judge was not an abuse of his discretion under Massachusetts law and that no prejudicial error occurred. The question for this habeas court is whether the trial judge's evidentiary rulings, as construed by the SJC, amounted to a constitutional violation sufficient to warrant habeas corpus relief by depriving petitioner of his right to put on an adequate defense under the Sixth Amendment. This is a high hurdle. *See, e.g., Palmariello v. Superintendent of Massachusetts Correctional Institution— Norfolk,* 873 F.2d 491, 494 (1st Cir.1989) ("Habeas review does not ordinarily encompass garden-variety evidentiary rulings.") (citations omitted), *cert. denied,* 493 U.S. 865, 110 S.Ct. 185, 107 L.Ed.2d 140 (1989); *Moran v. Vose,* 816 F.2d 35, 36–37 (1st Cir.1987) (per curiam) (stating that while "[i]t is true that, ordinarily, issues concerning the admission of evidence ... present solely state law questions (which are not matters proper for a § 2254 petition) and are not of constitutional dimension, an evidentiary or other ruling so fundamentally unfair as to deny due process is an appropriate basis for habeas relief") (citations omitted); *Allen v. Snow,* 635 F.2d 12, 15 (1st Cir.1980), *cert. denied,* 451 U.S. 910, 101 S.Ct. 1981, 68 L.Ed.2d 299 (1981)(stating that in order for an alleged state court evidentiary ruling error to violate due process, "such an error must so infuse the trial with inflammatory prejudice as to render a fair trial impossi-

ble")(internal quotation marks omitted). In other words, petitioner must persuade this habeas court not only that the SJC erred in ruling that the trial court did not commit error, but that the SJC's decision—that defendant's trial was fundamentally fair—is contrary to or an objectively unreasonable application of clearly established federal constitutional law.

## B. Sixth Amendment Supreme Court Jurisprudence

■ The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)(quotation and citations omitted).

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.,* discredit, the witness.... A ... particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' 3A J. Wigmore, *Evidence* § 930, p. 775 (Chadbourne rev.1970). We have recognized that the exposure of

a witness' motivation in testifying is a proper and important function of a constitutionally protected right of cross-examination. *Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959).

*Id.* at 316–17, 94 S.Ct. 1105.

■ The Supreme Court has determined, however, that the Sixth Amendment Confrontation Clause does not prevent a trial judge

> from imposing any limits on defense counsel's inquiry into potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude in so far as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.... [T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (citations and quotation marks omitted).

■ In further defining a defendant's rights under the Sixth Amendment, the Supreme Court held that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to [a] harmless-error analysis" under which a reviewing court would assess the following factors (often called the "*Van Arsdall* factors"): the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimo-

ny of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. *Id.* at 684, 106 S.Ct. 1431. These factors are analyzed in terms of the harmless error standard announced in *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) that applies on collateral review of a state court conviction (*i.e.*, habeas review as opposed to direct appellate review). The *Brecht* standard considers whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

The Sixth Amendment also guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI.

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. State of Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

 When deciding, in *Washington v. State of Texas*, that defendant's right to compulsory process was violated, the Supreme Court held that Texas' statute rendering accomplices or co-indictees incompetent to testify for each other violated the Constitution because it "arbitrarily denied [the defendant] the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." *Id.* at 23, 87 S.Ct. 1920. The Supreme Court's decision in *Washington* has been interpreted to mean that a defendant's right to compulsory process "prevents the state from arbitrarily excluding ... testimony" in a defendant's favor. *Perry v. Rushen*, 713 F.2d 1447, 1449 (9th Cir.1983). *See also Pettijohn v. Hall*, 599 F.2d 476, 481 (1st Cir.1979)(stating that, when determining whether in accordance with state law a trial judge's decision to exclude evidence passes muster under the Sixth Amendment, the reviewing court considers whether the state has offered "a sufficiently compelling purpose to justify the practice"). In other words, the right of the defendant to present evidence is not absolute and must be weighed along with the state's "rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (reversing conviction and remanding to Supreme Court of Mississippi because state interest in excluding third party hearsay confessions did not justify exclusion).

 Like an infringement on the right to confront witnesses, an infringement of the right to compulsory process under the Sixth Amendment is also subject to a harmless-error standard. *See Crane v. Kentucky*, 476 U.S. 683, 691, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (on direct review of the decision by the Supreme Court of Kentucky, agreeing with respondent that trial court's error of excluding testimony of defense witness is an error of constitutional dimension, is subject to

harmless error analysis, and that such an analysis should be considered by the state court in the first instance). *See also Petti-john,* 599 F.2d at 482 (in habeas case, applying harmless error standard to state court's erroneous exclusion of defendant's evidence). As a practical matter, of course, a habeas court reaches a harmless error analysis only if it has determined that defendant suffered from an error of constitutional dimension at trial.

## C. Due Process Right to Exculpatory Evidence

■ The Supreme Court has interpreted the Due Process Clause of the Fourteenth Amendment as requiring the state to disclose to criminal defendants exculpatory evidence. *See, e.g., California v. Trombetta,* 467 U.S. 479, 480, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■ Under this jurisprudence that has "loosely be[en] called the area of constitutionally guaranteed access to evidence," *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), the state has the obligation to "deliver[ ] exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system." *Trombetta,* 467 U.S. at 485, 104 S.Ct. 2528. For example, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment imposed. *See Brady,* 373 U.S. at 87, 83 S.Ct. 1194. Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would

raise a reasonable doubt about the defendant's guilt. *See Agurs,* 427 U.S. at 112, 96 S.Ct. 2392. In *California v. Trombetta,* the Supreme Court determined, however, that the government does not have an affirmative duty to preserve evidence on behalf of criminal defendants that was not expected to play a significant role in the defendant's defense. *See Trombetta,* 467 U.S. at 488, 104 S.Ct. 2528.

In *Trombetta,* the Supreme Court had to decide whether the Due Process Clause requires law enforcement agencies to preserve breath samples of suspected drunken drivers in order for the results of breath-analysis tests to be admissible in criminal prosecutions. The Supreme Court acknowledged that this question poses practical problems, a part of which is

the difficulty of developing rules to deal with evidence destroyed through prosecutorial neglect or oversight. Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed. Moreover, fashioning remedies for the illegal destruction of evidence can pose troubling choices. In nondisclosure cases, a court can grant the defendant a new trial at which the previously suppressed evidence may be introduced. But when evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing . . . the State's most probative evidence.

*Id.* at 486–87, 104 S.Ct. 2528.

The Court determined, in *Trombetta,* that the state's (California's) failure to preserve the breath samples did not violate the United States Constitution. The Court determined that under the facts of the case, the California authorities did not destroy the samples in a calculated effort

to circumvent the disclosure requirements under *Brady*. Also, the Court emphasized that the evidence destroyed did not meet the *Agurs* standard of materiality whereby "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489, 104 S.Ct. 2528.

In *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the Supreme Court had the opportunity to re-iterate its holding in *Trombetta*, further delineating the factors at stake when ana-lyzing whether the destruction of evidence rises to a constitutional dimension. The Supreme Court's reasoning for rejecting defendants' argument was as follows:

> [F]irst, the officers here were acting in good faith and in accord with their nor-mal practice; second, in light of the procedures actually used the chances that preserved samples would have ex-culpated the defendants were slim; and third, even if the samples might have shown inaccuracy in the tests, the defen-dants had alternative means of demon-strating their innocence.

*Youngblood*, 488 U.S. at 56, 109 S.Ct. 333 (quotations and citations omitted).

 The Court went on, in *Young-blood*, to state that good or bad faith on the part of the state officials is irrelevant for a due process analysis when the de-stroyed evidence was material, exculpatory evidence. *See id.* at 57, 109 S.Ct. 333. Good or bad faith is relevant and part of a weighing test applied in considering a due process argument, however, when the na-ture of the evidence (its exculpatory value) is ambiguous. *See id.* The Court de-clared that when the state fails "to pre-serve evidentiary material of which no more can be said than that it could have

been subjected to tests, the results of which might have exonerated the defen-dant, ... unless the criminal defendant can show bad faith on the part of the police, failure to preserve potentially use-ful evidence does not constitute a denial of due process of law." *Id* at 57–58, 109 S.Ct. 333. The threshold inquiry, then, accord-ing to Supreme Court doctrine, is whether the evidence destroyed was material, ex-culpatory evidence or instead was merely potentially useful to the defendant. *See Trombetta*, 467 U.S. at 489–90, 104 S.Ct. 2528; *Youngblood*, 488 U.S. at 56, 58, 109 S.Ct. 333. *See also Youngblood*, 488 U.S. at 59–60, 109 S.Ct. 333 (Stevens, concur-ring); *United States v. Alston*, 112 F.3d 32, 35–36 (1st Cir.1997).

## D. The Clearly Established Federal Law in Light of SJC's Decision in *Com. v. DiBenedetto*

### 1. Excluding Evidence of Storella's Al-leged Motive to Protect the LCN

 As noted earlier, in deciding that the trial judge's decisions to prohibit cross-examination of Storella on his alleged mo-tive to protect the LCN did not prejudice the defense, the SJC declared:

> The judge did not abuse his discretion in excluding testimony intended to show that the victims, strong-arm men in the crew of La Cosa Nostra (LCN) crimi-nals, were killed by fellow LCN mem-bers as "fall-out" from an earlier LCN murder of one Vincent Limoli. The judge concluded that the Limoli murder was remote and that the proffered evi-dence was complicated and would divert the jury's attention. The defendants did not offer evidence, other than specula-tion, that some third person or persons had a motive to kill the victims because of Limoli's murder. Nor did they show that the killings in this case were suffi-

ciently similar to the Limoli killing to warrant admission.

The defendants further argue that the judge improperly restricted their cross-examination of Storella on the same subject to show his bias. The judge barred DiBenedettos' counsel from seeking to establish on cross-examination that, because of the Limoli murder, Storella had accused the defendants falsely, out of fear, in order to protect the real killers. This was a matter within the judge's discretion. The defendants did not make a plausible showing that circumstances existed on which the alleged bias could be based.

*Com. v. DiBenedetto,* 427 Mass. at 420–21, 693 N.E.2d 1007 (citations omitted).

Petitioner contends that the SJC's decision that the trial judge did not abuse his discretion when he limited the cross-examination of Storella regarding his alleged involvement with the LCN is contrary to and an unreasonable application of the Supreme Court jurisprudence protecting a defendant's Sixth Amendment right to confront witnesses against him. A review of the trial record, a record that encompasses nineteen volumes of transcripts, and of Massachusetts case law concerning the admissibility of "third-party culprit-type evidence" (Trial Transcript of February 1, 1994 at 4), does not support Petitioner's contention. The SJC did not err in ruling that the trial judge was within his discretion to limit the cross-examination of Storella. The SJC ruling was consistent with Supreme Court jurisprudence defining the scope of the Confrontation Clause and its bearing on scope of cross-examination.

It is not correct to say, as petitioner does, that he was prohibited from contending or offering proof of the fact that Storella was biased or that he was a liar. Defense counsel for DiBenedetto and for Costa cross-examined Storella for two days. During both direct examination and cross-examination, Storella admitted to lying on numerous occasions, to police officers, to attorneys, under oath, and even when protected from an immunity agreement. *See generally,* Trial Transcripts of January 24, 1994 at 59–215 and January 25, 1994 at 3–295. Both defense attorneys at trial had ample opportunity to question Storella about the scope and effect of his immunity agreement with the Commonwealth. *See, e.g.,* Trial Transcript of January 25, 1994 at 23–27. Storella was questioned about his reason for fleeing the state before the first trial of the defendants. *See, e.g.,* Trial Transcript of January 25, 1994 at 247–50. After having admitted to the court and jury that he led the two victims to their deaths on February 19, 1986—two victims who were long time friends of his—he was questioned about his demeanor and feelings about attending the wake of the two victims and offering condolences to the victims' families. *See, e.g.,* Trial Transcript of January 24, 1994 at 242–45. It is apparent from the trial transcripts and the arguments of all involved counsel that Storella was repeatedly discredited as being a self-interested and untrustworthy witness for the prosecution as well as a despicable person. To say, as the petitioner does, that the judge committed prejudicial error by cutting off one line of cross-examination that would have allegedly shown yet another reason for Storella to lie or otherwise be untrustworthy greatly exaggerates the effect of the judge's ruling. A more balanced assessment of the record, one that the SJC provides and in which I concur after thorough review, is that the defendants were prevented from offering into evidence yet another reason for which Storella may be biased and lying under oath. The exclusion of such cumulative evidence—evidence of bias, untrustworthiness, and general unsavoriness—amidst all

such evidence already before the jury was within the trial judge's discretion and was not error.

In determining that the trial judge did not err, the SJC did not reach the Sixth Amendment issue of a defendant's right to confront witnesses against him and did not discuss its ruling in constitutional terms. The result reached by the SJC does not offend the Constitution, however. As discussed above, *see* Part V.B, the Supreme Court has not held that the Constitution mandates that a defendant be allowed to cross-examine witnesses against him for all possible bias or motives for lying. *See Van Arsdall*, 475 U.S. at 679, 106 S.Ct. 1431. On the contrary, the Sixth Amendment right to confront witnesses is a right to "effective cross-examination," *id.*, which is evaluated in the context of the specific facts and evidence in the case and in terms of the factors announced in *Van Arsdall. See id.* at 684, 106 S.Ct. 1431. In light of those factors—the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case—the trial judge's exclusion of cross-examination on Storella's alleged involvement with the LCN was not constitutional error. Storella's testimony was central to the prosecution's case, but his credibility was impeached repeatedly throughout the trial, and thus the weight of his testimony had already and constantly been called into question. Further testimony about his reasons for lying would have been cumulative. Cross-examination on other topics was thoroughly explored; this is not a case in which very little cross-examination was permitted.

Finally, the judge's determination that was subsequently affirmed by the SJC that the defendants failed to "offer evidence, other than speculation, that some third person or persons had a motive to kill the victims because of [the murder four months earlier] of [Vincent] Limoli[ ]" strongly weighs against defendant's Sixth Amendment argument. *Com. v. DiBenedetto*, 427 Mass. at 420–21, 693 N.E.2d 1007. In determining that the trial judge did not err in concluding that the defendants failed to proffer evidence that would corroborate or contradict Storella's hoped-for testimony on what the defense considered to be the material point of the LCN involvement in the double-murder, the SJC was implicitly affirming the trial judge's factual-legal determinations as to remoteness and proximity of the Limoli murder to the double-homicide for which DiBenedetto and Costa were standing trial. This factual determination is presumed correct under 28 U.S.C. § 2254(e) and can be rebutted only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e); *Coombs v. State of Maine*, 202 F.3d 14, 18 (1st Cir.2000). After a lengthy trial and many hearings regarding the relevance of the Limoli murder to the murders of Bottari and Chuichiolo, the trial judge was in the best position to judge the remoteness of the LCN involvement to the charges against DiBenedetto and Costa. *See, e.g.*, Trial Transcript of February 1, 1994 at 3–21. Nothing in the record before this habeas court demonstrates by clear and convincing evidence that the factual determinations made by the trial judge and affirmed by the SJC that were the basis of his limitation of Storella's cross-examination were an abuse of discretion that, when considered in the context of the other *Van Arsdall* factors, would violate the defendant's right to confront witnesses against him.

For these reasons, the SJC's determination that restricting the cross-examination of Storella was not prejudicial to defendants' case is a sustainable result under the guiding principles of the Supreme Court's Sixth Amendment jurisprudence.

### 2. *Excluding the Expert Testimony*

 With regard to the conclusion that the trial judge did not err in excluding the expert testimony that would have cast doubt on the prosecution's eyewitness identification, the SJC relied on an earlier SJC opinion on the admissibility of expert testimony concerning the reliability of eyewitness identifications:

> We have recently considered, and need not revisit, the question of the admission of expert testimony concerning the reliability of eyewitness identifications. *See Commonwealth v. Santoli,* 424 Mass. 837, 841–844, 680 N.E.2d 1116 (1997); *Commonwealth v. Walker,* 421 Mass. 90, 96, 653 N.E.2d 1080 (1995); *Commonwealth v. Hyatt,* 419 Mass. 815, 818, 647 N.E.2d 1168 (1995). The judge knew he had discretion to admit or exclude such evidence that the defendants offered. He did not abuse his discretion in excluding it. This is not a case in which there was a single eyewitness and little or no evidence to corroborate the identification. *Commonwealth v. Santoli, supra* at 842, 680 N.E.2d 1116.
>
> We also adhere to the position we took in our *Santoli* opinion that only in cases tried thereafter must the statement that the jury may consider the strength of a witness's identification be omitted from the standard charge concerning eyewitness identification. *See Commonwealth v. Payne,* 426 Mass. 692, 698, 690 N.E.2d 443 (1998); *id.* at 845, 690 N.E.2d 443, 424 Mass. 837, 680 N.E.2d 1116. No significant constitu-

tional question is presented by the giving of that instruction in this case.

*Id.* at 420, 693 N.E.2d 1007.

The SJC determined correctly that under Massachusetts law the decision to admit expert testimony is within the discretion of the trial judge and that no constitutional violation occurred in the DiBenedetto–Costa trial when the trial judge prohibited the defense from calling an expert on eyewitness identification. Petitioner's claim of a violation of his right to compulsory process therefore fails under the Supreme Court's Sixth Amendment jurisprudence that treats a defendant's right to call witnesses in his favor as a right that prevents the state from arbitrarily excluding testimony that would aid in defendant's case. *See Washington v. Texas,* 388 U.S. at 23, 87 S.Ct. 1920; *Chambers v. Mississippi,* 410 U.S. at 302, 93 S.Ct. 1038; *Pettijohn,* 599 F.2d at 481. The trial judge did not arbitrarily exclude the expert testimony. On the contrary, the judge made a reasoned decision that he understood to be within his discretion under the Massachusetts case law, in terms of the complex and contested facts of the case, and as a matter of prudential management of trial process, that the defense expert would not be permitted to be called to testify to opinions regarding the false correlation between eyewitness confidence and accuracy in identification. *See, e.g.,* Trial Transcript January 27, 1994 at 13–15.

The admissibility of expert testimony in the area of eye witness identification remains a widely debated topic in Massachusetts and Federal case law. *Compare Commonwealth v. Santoli,* 424 Mass. 837, 680 N.E.2d 1116 (1997) *with Commonwealth v. Hyatt,* 419 Mass. 815, 647 N.E.2d 1168 (1995); *see United States v. Hines,* 55 F.Supp.2d 62 (D.Mass.1999). Some courts have determined that the credibility and

weight given to an eyewitness's identification may properly be left to the common sense of the jury as a matter distinctly within the ken of the jury. *See, e.g., Commonwealth v. Francis,* 390 Mass. 89, 453 N.E.2d 1204, 1208–09 (1983). Other courts, however, have determined that such testimony would "not only surpass common-sense evaluation, it would question common-sense evaluation." *United States v. Smith,* 736 F.2d 1103, 1106 (6th. Cir.), *cert. denied,* 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984). *See also United States v. Hines,* 55 F.Supp.2d at 71–72 (discussing the relevance and helpfulness of expert testimony on the decreased accuracy of cross-racial identification relative to same-race identification). The Massachusetts case-law cannot be fairly characterized as arbitrary, but instead as evolving and sensitive to on-going developments in the field. *See, e.g., Santoli,* 424 Mass. at 843–44, 680 N.E.2d 1116. The judge's ruling in this case, in light of this case law and with knowledge of it, *see* Trial Transcript of January 27, 1994 at 13, took into account the traditional role of the jury in judging credibility and weighing evidence and concluded that the preservation of that historic jury role, under the facts of the case, was a sufficiently compelling reason to exclude the proposed expert testimony.

I note that the SJC's determination that "[t]his is not a case in which there was a single eyewitness and little or no evidence to corroborate the identification" is amply supported by the trial record. *See Com. v. DiBenedetto,* 427 Mass. at 420, 693 N.E.2d 1007. Storella's testimony, as flawed and incredible as it was, contained elements that a jury might reasonably evaluate as confirming many key points of Schindler's eyewitness account. *See, e.g.,* Trial Transcript of January 24, 1994 at 128–147. Also, ballistics evidence corroborated both accounts of Storella and Schindler concerning caliber of guns used and number of shots fired. *See* Trial Transcript of January 27, 1994 at 166–179. Finally, the issues about which the expert was to testify were thoroughly covered on cross-examination by defense counsel. Defense counsel cross-examined Schindler for two days, questioning the time he had to observe the assailants, his ability to observe through trees and window glare at night, and his emotions at the time. *See* Trial Transcript of January 20, 1994 at 26–40, 50, 58 (time to observe); 64–65 (distance from the scene); 66 (feelings of nervousness); 65 (discussing moonlight and lamplight); 26 (discussing window glare). Defense counsel also cross-examined Schindler regarding his improper legal help on behalf of the district attorney's office and thus his possible bias against the defendant. *See id.* at 127; Trial Transcript of January 21, 1994 at 93. Defense counsel also examined Schindler on the possible contamination of his identification of the shooters from seeing newspaper photographs of DiBenedetto before the line-up and seeing bagged evidence in the district attorney's office, such as DiBenedetto's Nike sneakers. *See* Trial Transcript of January 21, 1994 at 183; Trial Transcript of January 20, 1994 at 128, 130, 142. Defense counsel also had the opportunity to call two former co-workers of Schindler who testified that they had no recollection of being asked by Schindler to sanitize the daily newspapers by cutting out photographs of the murder suspects in order to prevent Schindler from being improperly influenced by them. *See* Trial Transcript of February 1, 1994 at 27. This testimony contradicted Schindler's statement that he asked his former secretary and law partner to do just that. *See* Trial Transcript of January 20, 1994 at 130. Given this thorough cross-examination and key corroboration, the trial judge's prohibition of the defense's ability to cast doubt on the prosecution's eyewit-

ness did not unfairly tilt the balance in the Commonwealth's favor.

In light of the facts of this case and the state of Massachusetts law at the time the trial judge exercised his discretion to exclude the expert testimony on eyewitness identification, I cannot conclude, as petitioner urges me to do, that the SJC acted improperly in determining that the judge did not err in his evidentiary ruling and that no "significant constitutional question is presented" by not giving the *Santoli* instruction to the jury. *Com. v. DiBenedetto*, 427 Mass. at 420, 693 N.E.2d 1007. The examination and cross-examination of Schindler afforded the jury an adequate opportunity to assess the reliability of his identification of the petitioner. The defense was not prohibited from presenting its version of the facts. *See, e.g.*, Trial Transcript of February 2, 1994 at 33–50, 75–88. It was not error to leave the judgment of those facts to the jury. The SJC's decision affirming the trial judge's ruling is neither contrary to nor an unreasonable application of clearly established Sixth Amendment jurisprudence.

### 3. Allowing Into Evidence Last–Minute Test Results on DiBenedetto's Sneakers

██ Concluding that the Commonwealth's failure to comply with the pretrial conference report and conduct destructive testing on DiBenedetto's sneakers did not prejudice the defense, the SJC stated:

There is no doubt that the Commonwealth failed to comply with the pretrial report. The question is whether the defendants were prejudiced by the breach. *See Commonwealth v. Gliniewicz*, 398 Mass. 744, 748–749, 500 N.E.2d 1324 (1986). In the *Gliniewicz* case, the pretrial conference report explicitly obliged the Commonwealth to make certain evidence available for inspection.

In the course of its testing, the Commonwealth destroyed a portion of the defendant's boots with the result that the defendant could not possibly duplicate the tests. We held that the Commonwealth's test results should not have been admitted. *Id.* at 749, 500 N.E.2d 1324. "[W]hen potentially exculpatory evidence is lost or destroyed, a balancing test is employed to determine the appropriateness and extent of remedial action. The courts must weigh the culpability of the Commonwealth, the materiality of the evidence and the potential prejudice to the defendants." *Commonwealth v. Willie*, 400 Mass. 427, 432, 510 N.E.2d 258 (1987). To establish prejudice, the defendant must show "a 'reasonable possibility, based on concrete evidence rather than a fertile imagination,' that access to the [material] would have produced evidence favorable to the case." *Id.* at 433, 510 N.E.2d 258, quoting *Commonwealth v. Neal*, 392 Mass. 1, 12 464 N.E.2d 1356 (1984).

The test conducted by each expert in this case was substantially the same. The chance to replicate the test on the left sneaker was probably lost because Brody's testing removed the very small amount of blood at the test site. The defendant's expert found indications that blood was present on the other sneaker. There seems to be little doubt that one or both the defendant's sneakers tested positive for presence of a minute amount of what was either the blood of a human or some other animal or perhaps certain plant peroxidases. The judge did not abuse his discretion in admitting the blood test results. The defendants have failed to demonstrate that they were prejudiced by Brody's testing of the sneakers for blood. This case, therefore differs from *Commonwealth v. Gliniewicz*, supra at 748–749, 500 N.E.2d 1324, where the Commonwealth prejudicially

destroyed sections of the defendant's boots in violation of the pretrial conference report, thereby making any similar test by the defendant impossible.

*Com. v. DiBenedetto,* 427 Mass. at 419–421, 693 N.E.2d 1007.

The SJC's decision and reasoning parallel the Supreme Court's decisions in *Trombetta* and *Youngblood.* The SJC rehearsed its weighing test to determine the appropriate remedy for state loss or destruction of potentially exculpatory evidence. The factors of the Commonwealth's weighing test mirror those stated in both *Trombetta* and *Youngblood* and are as follows: materiality of evidence, culpability of the state, and the prejudice suffered by defendant. *Com. v. DiBenedetto,* 427 Mass. at 419, 693 N.E.2d 1007. Like the Court in *Youngblood,* which indicated that materiality was the threshold factor in any evaluation under the Due Process Clause, the SJC made the determination that the minute amount of blood found on the left sneaker that was subsequently untestable was immaterial to the defendant's case so that its admission into evidence was not prejudicial. *See id.* The SJC based its determination of immateriality on the record before it, including the fact that the defendant's expert found blood on the other sneaker as well as the fact that the blood found by either expert could not definitively be characterized as human blood. *See id.* Also, the defendants had the opportunity to cross-examine the prosecution's witnesses thoroughly on the possibility of contamination, the unusual and somewhat circumspect manner in which the left sneaker was tested for blood on the eve of trial, and the fact that defendant's experts did not turn up any inculpatory results on either sneaker until they were asked to conduct testing for a second time. *See* Trial Transcript of January 28, 1994 at 94–114, 154 (chain of custody and possibility of tampering); 117 (no disposi-

tive results first time); 122 (inconclusive as to whether blood is human or animal); Trial Transcript of January 31, 1994 at 33 (negative results the first time); 43 (inconclusive as to whether blood is animal or human); 117 (calling amount of blood "minute").

In the circumstances of this case, it was entirely reasonable to conclude that it is highly unlikely that the blood evidence that was destroyed would have helped the defendant's case. In these circumstances, the SJC's determination that the admission of the prosecution's blood evidence did not prejudice the defense was not contrary to or an unreasonable application of Supreme Court jurisprudence. *See Trombetta,* 467 U.S. at 489, 104 S.Ct. 2528. On the contrary, the SJC's reasoning very closely tracks this Supreme Court jurisprudence, and the result of the SJC's decision, affirming the trial court's ruling, is a result that is harmonious with the clearly established federal law preserving a defendant's access under the Due Process Clause to evidence material to guilt or to punishment. *See, e.g., United States v. Agurs,* 427 U.S. at 109–110, 96 S.Ct. 2392.

## VI. Analysis of Sufficiency of the Evidence

### A. Introduction

Petitioner's last claim for habeas relief is that insufficient evidence existed to convict him of murder in the first degree under a theory of joint venture or accessory before the fact and that the SJC's decision holding otherwise is contrary to the clearly established framework rule of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Petitioner bases this claim on the judge's erroneous jury instructions on joint venture in which, in the SJC's words, the judge "erroneously combined language

concerning guilt as an accessory before the fact (not requiring proof of the defendant's presence at or near the crime scene) with language concerning guilt as a joint venturer and thus failed to make explicit that guilt as a joint venturer required the defendant's presence at or near the crime scene." *Com v. DiBenedetto*, 427 Mass. at 422–23, 693 N.E.2d 1007. Petitioner argues that where there was insufficient evidence to convict him as a joint venturer, because the jury could have had doubt as to whether or not he was present at the scene of the shooting, the general verdict of the jury under a charge that muddled the requirement that the defendant be present at the scene of the crime in order to be convicted as a joint venturer, enabled the jury to find the defendant guilty of murder without satisfying all elements of the crime beyond a reasonable doubt.

## B. Supreme Court Jurisprudence on Sufficiency of the Evidence

The standard governing challenges to the sufficiency of the evidence in habeas corpus proceedings was laid out by the Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "The relevant question is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. 2781.

The Court of Appeals for the First Circuit has recently held that this standard "sufficiently shape[s] the contours of an appropriate analysis of a claim of constitutional error to merit review of a state court's decision under section 2254(d)(1)'s 'contrary to' prong." *O'Brien v. Dubois,* 145 F.3d 16, 25 & n. 6 (1st Cir.1998). ▮ The Supreme Court has also held, relative to *Jackson,* that the Due Process

Clause does not require that a general jury verdict of guilty be set aside when the evidence is insufficient to support beyond a reasonable doubt one of the grounds of liability so long as the guilty verdict is supportable on an alternative theory also submitted to the jury. *See Griffin v. United States,* 502 U.S. 46, 51, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). *See also id.* at 58, 112 S.Ct. 466 (citing with approval *United States v. Townsend,* 924 F.2d 1385, 1414 (1991)) ("It is one thing to negate a verdict that, while supported by evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance—remote, it seems to us—that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient.")

## C. Clearly Established Federal Law on the Sufficiency of the Evidence in Light of *Com. v. DiBenedetto*

▮ The SJC's decision, determining that the erroneous jury instructions did not affect the jury's verdict, is as follows:

The judge gave an instruction on joint venture that Costa's counsel requested and to which DiBenedetto's counsel did not object at any time. We do not review jury instructions in such a situation (*Commonwealth v. Callahan,* 401 Mass. 627, 631, 634 n. 9, 519 N.E.2d 245 [1988]), except to determine whether they created a substantial likelihood of a miscarriage of justice (*see Commonwealth v. Ward,* 412 Mass. 395, 398, 590 N.E.2d 173 [1992]). The instruction on joint venture erroneously combined language concerning guilt as an accessory before the fact (not requiring proof of the defendant's presence at or near the crime scene) with language concerning guilt as a joint venturer and thus failed to make explicit that guilt as a joint

venturer required the defendant's presence at or near the crime scene. *See Commonwealth v. Lafayette*, 40 Mass. App.Ct. 534, 539–541 & n. 7, 665 N.E.2d 1025 (1996). However, the instruction could not have led to an unjustified verdict. There was evidence of conduct by the defendants before the trial that would have warranted a finding that each was an accessory before the fact, a charge that was within the scope of the indictment. *See* G.L. c. 274, § 2; *Commonwealth v. Perry*, 357 Mass. 149, 151, 256 N.E.2d 745 (1970). The challenged instruction did not create a substantial likelihood of a miscarriage of justice. In practical terms, the case was tried and argued on the theory that the defendants were the shooters. The invited error in the judge's charge could not have had any effect on the verdict.

In these circumstances, where there was evidence that the victims' deaths were caused by the combined actions of two people, but it was not clear who dealt the fatal blows, each defendant may properly be convicted based on joint venture liability. *See Commonwealth v. Drumgold*, 423 Mass. 230, 253–254, 668 N.E.2d 300 (1996); *Commonwealth v. Semedo*, 422 Mass. 716, 720–721, 665 N.E.2d 638 (1996). *Cf. Commonwealth v. Green*, 420 Mass. 771, 780, 652 N.E.2d 572 (1995) (evidence that only defendant was shooter bars joint venture liability). The judge did not err in denying the defendants' motions for findings of not guilty on the theory of joint venture.

*Com. v. DiBenedetto*, 427 Mass. at 422–23, 693 N.E.2d 1007.

Petitioner's argument fails because the Supreme Court's decisions in *Jackson* and *Griffin* do not compel a different result than that reached by the SJC. *See O'Brien v. Dubois*, 145 F.3d at 24–25. A thorough review of the trial transcripts strengthens this conclusion. Each of the victims had been shot by bullets fired by three different guns; each of the victims suffered multiple gun shot wounds. *See, e.g.*, Trial Transcript of January 27, 1994 at 166–70. The SJC determined that this ballistic and forensic evidence was sufficient to warrant a finding beyond reasonable doubt that both DiBenedetto and Costa fired shots and that either DiBenedetto or Costa the fatal ones. This means that conviction on a theory of joint venture liability is permissible. *See Commonwealth v. Green*, 420 Mass. 771, 780, 652 N.E.2d 572 (1995). Because the SJC also determined that the testimony before the court was sufficient to enable the jury to find that both DiBenedetto and Costa were accessories before the fact, the erroneous jury instruction was harmless. Both of these determinations by the SJC comport with the rule prescribed by the Supreme Court in *Jackson*. Affirmance of the trial judge's denial of the motion for acquittal was a reasonable application of the precedent established by *Griffin*.

### ORDER

For the reasons stated in the foregoing memorandum, it is hereby ORDERED:

The Clerk is directed to enter on a separate document a Final Judgment as follows:

For the reasons stated in the Memorandum and Order of this date, Petitioner DiBenedetto's Petition for Writ of Habeas Corpus is denied.

### Final Judgment

For the reasons stated in the Memorandum and Order of this date, Petitioner DiBenedetto's Petition for Writ of Habeas Corpus is denied.